# 23-1078-CV

IN THE

# United States Court of Appeals
# for the Second Circuit

MICHAEL GRECCO PRODUCTIONS, INC.,

*Plaintiff-Appellant,*

---v.---

RADESIGN, INC., DAVIS BY RUTHIE DAVIS, INC., RUTHIE
ALLYN DAVIS, RUTHIE DAVIS, INC., DOES 1-5,

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

**BRIEF OF AMERICAN SOCIETY OF MEDIA PHOTOGRAPHERS
AND OTHER PROFESSIONAL TRADE ASSOCIATIONS, PHOTO
AGENCIES, AND TECHNOLOGICAL COMPANIES AS *AMICI
CURIAE* IN SUPPORT OF APPELLANT, URGING REVERSAL**

*Of Counsel:*
Thomas Maddrey
   *Chief Legal Officer*
AMERICAN SOCIETY OF MEDIA
PHOTOGRAPHERS
Four Embarcadero Center
Suite 1400
San Francisco, CA 94111

Peter E. Perkowski
   *Counsel of Record*
PERKOWSKI LEGAL, P.C.
*Attorneys for Amicus Curiae*
515 S. Flower St.
Suite 1800
Los Angeles, CA 90071
Tel: 213-340-5796

# DISCLOSURE STATEMENT

In accordance with Rule 26.1 of the Federal Rules of Appellate Procedure, each of the Amici, by and through their undersigned counsel, hereby certifies that it has no parent corporation and that no publicly held corporation owns 10% or more of its stock.

*Of Counsel:*
Thomas Maddrey
    *Chief Legal Officer*
AMERICAN SOCIETY OF MEDIA
PHOTOGRAPHERS
Four Embarcadero Center
Suite 1400
San Francisco, CA 94111

s/  Peter Perkowski
Peter E. Perkowski
PERKOWSKI LEGAL
*Attorneys for Amici*
515 S. Flower St., Suite 1800
Los Angeles, CA 90071
Tel: 213-340-5796

*Attorneys for Amici Curiae*

# TABLE OF CONTENTS

Page

DISCLOSURE STATEMENT ....................................................................i

TABLE OF AUTHORITIES ................................................................ iii

INTEREST OF AMICI ........................................................................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT........................... 4

ARGUMENT ........................................................................................... 7

I.  For copyright infringement of visual works in the digital
    universe, statute of limitations analysis must account for
    the magnitude of the problem and limitations of solutions........ 7

    A.  The scope of the infringement problem is enormous,
        and solving it presents significant challenges. .................. 7

    B.  Tools available to combat internet piracy of digital
        images are limited in ways that affect when and
        how unauthorized uses are found. ...................................... 9

II. Robust and effective copyright protection rules are key to
    the livelihoods of photographers and other visual content
    creators. ..................................................................................... 16

    A.  Copyright protection is crucial for Amici and the
        photographers and visual content creators they
        represent. ........................................................................ 17

    B.  The ruling below punishes photographers with
        robust enforcement systems............................................. 20

CONCLUSION ..................................................................................... 23

# TABLE OF AUTHORITIES

Page(s)

## <u>Cases</u>

*Alaska Stock, LLC v. Houghton Mifflin Harcourt Publ'g Co.*,
  747 F.3d 673 (9th Cir. 2014) ............................................................17, 18

*Bell v. Wilmott Storage Servs., LLC*,
  12 F.4th 1065 (9th Cir. 2021) ...............................................................10

*Hirsch v. Rehs Galleries, Inc.*, No. 18 Civ. 11864 (VSB),
  2020 WL 917213 (S.D.N.Y. Feb. 26, 2020) ........................................20

*Mackie v. Hipple*, No. C09-0164 RSL,
  2010 WL 3211952 (W.D. Wash. Aug. 9, 2010) ...................................20

*MacLean Assoc., Inc. v. Wm. M. Mercer–Meidinger–Hansen, Inc.*,
  952 F.2d 769 (3d Cir.1991)...................................................................20

*Michael Grecco Prods., Inc. v. RADesign, Inc.*, No. 21-cv-8381,
  --- F. Supp. 3d ----, 2023 WL 4106162 (S.D.N.Y. June 20, 2023).........21

*Parisienne v. Scripps Media, Inc.*, No. 19 Civ. 8612,
  2021 WL 3668084 (S.D.N.Y. Aug. 17, 2021) ......................................20

## <u>Other Authorities</u>

Google Images,
  https://images.google.com/...................................................................11

Google Official Blog,
  Ooh! Ahh! Google Images presents a nicer way to surf the visual
  web (July 20, 2010),
  available at https://googleblog.blogspot.com/2010/07/ooh-ahh-
  google-images-presents-nicer.html.......................................................12

ImageRights,
  https://www.imagerights.com/ .............................................................11

Matic Broz,
  How many pictures are there (2023): Statistics, trends, and
  forecasts (Photutorial Aug. 23, 2023),
  available at https://photutorial.com/photos-
  statistics/#:~:text=750%20billion%20images%20are%20on,and%
  20only%207%25%20with%20cameras ...................................................8

Mingling Li & Wei-Ying Ma,
  *Image Search Engine* in Encyclopedia of Multimedia (2d ed.
  2008, Borko Furht, ed.) ........................................................10

Netcapital,
  Copytrack, available at
  https://netcapital.com/companies/copytrack ........................................8

Photodoto,
  How many images are on the internet? (and other Fascinating
  facts,
  available at https://www.photodoto.com/images-on-the-internet/ ........8

*Remarks of FCC Commissioner Mignon L. Clyburn*, Future of
  Music Coalition Policy Summit (Georgetown Univ. 2014), 2014
  WL 5461985 (Oct. 27, 2014) ..................................................18

Santi Thompson & Michele Reilly, A Picture Is Worth a Thousand
  Words, 68 J. Ass'n for Info. Sci. & Tech. 2264 (2017) .........................11

Tineye,
  https://tineye.com/ ..........................................................11

U.S. Bureau of Labor Statistics, Occupational Outlook Handbook,
  Photographers,
  available at https://www.bls.gov/ooh/media-and-
  communication/photographers.htm......................................................6

Yahoo! Image Search,
  https://images.search.yahoo.com/ ........................................11

## Rules

2d Cir. L.R. 29.1 ........................................................................ 1

Fed. R. App. P. 29(a)(4)(E) ...................................................... 1

## Constitutional Provisions

U.S. Const., art. I, § 8 ........................................................... 20

# INTEREST OF AMICI[1]

AMERICAN SOCIETY OF MEDIA PHOTOGRAPHERS, INC. ("ASMP") is a 501(c)(6) not-for-profit trade association, first established in 1944 to protect and promote the interests of professional photographers and all visual creators who earn their living by making works intended for publication, display, and every avenue of art and commerce. With over 6,500 members across 38 chapters and in 22 countries, working in every genre of photography, videography, content creation, and media, ASMP is a leading trade organization representing professional creators' interests.

NORTH AMERICAN NATURE PHOTOGRAPHY ASSOCIATION ("NANPA") is a 501(c)(6) non-profit organization founded in 1994. NANPA promotes responsible nature photography, both still images and motion, as an artistic medium for the documentation, celebration, and protection of the natural world. NANPA is a critical advocate for the rights of nature

---

[1] In accordance with Fed. R. App. P. 29(a)(4)(E) and this Court's L.R. 29.1, Amici certify that (a) no party's counsel authored this brief in whole or in part; (b) no party or its counsel contributed financial support intended to fund the preparation or submission of this brief; and (c) no individual or organization other than Amici, its members, and its counsel contributed financial support intended to fund the preparation or submission of this brief.

photographers on a wide range of issues, from intellectual property to public land access.

AMERICAN PHOTOGRAPHIC ARTISTS ("APA") is 501(c)(6) not-for-profit organization run by, and for, professional photographers since 1981. Recognized for its broad industry reach, APA works to champion the rights of photographers and image-makers worldwide.

The NATIONAL PRESS PHOTOGRAPHERS ASSOCIATION ("NPPA") is a 501(c)(6) non-profit organization dedicated to the advancement of visual journalism in its creation, editing and distribution of copyrighted works. NPPA's members include television and still photographers, editors, students, and representatives of businesses that serve the visual journalism industry. Since its founding in 1946, NPPA has vigorously promoted and defended the rights of photographers and journalists, including intellectual property rights and freedom of the press in all its forms, especially as it relates to visual journalism.

XPOSURE PHOTO AGENCY INC. is a is a photo agency that represents dozens of the world's most well-known photographers as contributors, licensing their photographic works to leading magazines, newspapers, and editorial clients throughout the world. Xposure maintains a library

of millions of photographs on a diverse range of popular subjects—celebrities from the music, sports and fashion industries, politicians and royalty, and newsworthy events—and, on behalf of itself and its contributors, frequently uses the copyright laws to combat online piracy of digital images in its library.

OKULARITY, INC. is an information technology services company that uses proprietary, specially designed software to locate digital images on the internet and match them to copyrighted images of its customers. Okularity provides services to photo agencies and individual photographers, among others. Based on its work, Okularity is well-familiar with the technological problems and challenges that arise when attempting to access and crawl the internet for digital visual content and match them to copyrighted images.

Amici represent hundreds of thousands of photographers and other visual artists, manage the licensing of millions of photographs and videos, and devote massive resources to combatting rampant internet piracy of digital images. All are deeply involved in protecting photographers' rights and interests, including by asserting copyright infringement claims against those who use artists' intellectual property

without a license or beyond the scope of license terms. This important work provides Amici with a keen awareness of both the practical and legal ramifications of the district court's decision below.

Amici are united in their belief that effective copyright enforcement is essential to maintaining the value of artistic works and preserving the ability of creators to earn income from their profession. Amici also share a concern that the ruling below will severely hamper content creators' ability to address the wide-scale unauthorized use of their copyrighted visual works online.

Amici file this brief under Rule 29(a) of the Federal Rules of Appellate Procedure and upon the accompanying motion for leave.

## INTRODUCTION AND SUMMARY OF ARGUMENT

The district court below ruled that a photographer who searches the internet to try to find infringements may not take advantage of the discovery rule that is available to photographers who don't search for infringements. If, despite its efforts, it still took some time for Plaintiff-Appellant Michael Grecco Productions, Inc. ("MGP") to find the infringements that underly his claims, the failure to apply the discovery rule when his efforts finally bore fruit renders the rule meaningless. As

the district court further noted, there is even inconsistency in the application of the discovery rule among the district courts.

The application of the discovery rule in a common sense and equitable way is critical, as photographers and visual content creators are the lifeblood of the creative economy. Yet, as explained below, combatting rampant internet piracy of digital content is an enormous problem with no easy solution. There are an estimated 750 billion photos on the internet, increasing rapidly each day. For any one specific photographer, finding her own digital content in that sea would be difficult even with robust and reliable tools. But while there are tools available—including visual search engines using content-based image retrieval ("CBIR")—they are neither robust nor reliable at finding every single use of a specific image or set of images. These tools are black boxes, the capabilities of which are affected by technological limitations beyond the control of the user. A search query on a particular image may produce *some* hits, but no visual search engine can guarantee that it will find *all* hits.

Awareness and understanding of these technical limitations are important because of the consequences that flow from a decision here.

According to the Bureau of Labor Statistics, the median annual income for photographers last year was only $40,170.[2] Professional visual content creators already face daunting of threats to their livelihood, but the biggest is a digital world intent on stealing and reusing their works without renumeration or consent. Copyright protection is the key driver of value for creators, and any ruling that undermines that protection will take money from their pockets. To survive and thrive economically, photographers must be able to enforce and protect the most valuable assets they have: their copyrights.

Yet perversely, the ruling below effectively punishes content creators who work diligently to combat rampant internet piracy by subjecting them to a stricter statute-of-limitations rubric, one that would bar their claims if reverse-search technology fails to find every infringement within three years of use. Expecting this level of success is unrealistic in light of the limitations of reverse-image search technology; the viability of an infringement claims should therefore not be based the assumption that visual image search engines will achieve

---

[2] U.S. Bureau of Labor Statistics, Occupational Outlook Handbook, Photographers, available at https://www.bls.gov/ooh/media-and-communication/photographers.htm

perfect results. This Court should reverse in favor of a rule that accounts for when reverse-image search efforts actually find the infringement.

## ARGUMENT

If allowed to stand, the decision below will have a profoundly negative effect on the ability of photographers and other visual content creators to protect and enforce their copyrights.

I. **For copyright infringement of visual works in the digital universe, statute of limitations analysis must account for the magnitude of the problem and limitations of solutions.**

Any legal principle or decision that affects the ability of photographers and other content creators to protect their works from online piracy must begin with an understanding of the problem and its solutions. There are huge numbers of digital images online, but there are no tools available that will find them all.

A. **The scope of the infringement problem is enormous, and solving it presents significant challenges.**

To address infringement of digital content on the internet, photographers and creators first must find unauthorized uses. Finding specific infringements, however, is no easy task.

First, the internet contains billions of digital images, and that number is growing rapidly. Precise numbers are hard to determine, but estimates are eye-opening: One estimate put the number of images on the internet at 750 billion.[3] Another estimated that 3.2 billion more are uploaded every day.[4] Even if the actual number is just one-third of that, it represents substantial increase over time. Estimates of how many of those images are pirated are elusive. But some reports suggest that, of the total number of images uploaded, some 85% will be infringed.[5]

Second, professional photographers often have large and extensive libraries of digital images. Some photographers will create thousands of images in a weekend, but even those who create a smaller number in focused sessions will compile voluminous numbers of images over time. The greater the number of images, the greater the need to search for

[3] Matic Broz, How many pictures are there (2023): Statistics, trends, and forecasts (Photutorial Aug. 23, 2023), available at https://photutorial.com/photos-statistics/#:~:text=750%20billion%20images%20are%20on,and%20only%207%25%20with%20cameras

[4] Photodoto, How many images are on the internet? (and other Fascinating facts, available at https://www.photodoto.com/images-on-the-internet/

[5] *Id.*; *see also* Netcapital, Copytrack, available at https://netcapital.com/companies/copytrack

and investigate infringements. And third, for many photographers, success brings increased visibility and popularity, thus multiplying the chance of infringement. The more compelling the photograph, the more likely it will be infringed. And more infringement increases the difficulty in finding and policing infringers.

Together, these factors present photographers with the daunting prospect of trying to find the proverbial needle in the haystack. Except that analogy fails to capture the true scope of the problem: an effective infringement mitigation strategy requires each individual photographer to find multiple copies of their own specific needles in a haystack full of other needles. In short, the infringement problem is massive in scope and ripe with intractable challenges for photographers.

B.    Tools available to combat internet piracy of digital images are limited in ways that affect when and how unauthorized uses are found.

While the scope of the problem is massive, the tools and processes available to combat it suffer from critical limitations that affect photographers' ability to find and address every pirated use on the internet.

## 1. Search tools have technological limitations.

Given the vastness of the internet, and the number of digital images on it, photographers need a technological assist if they wish to control the widespread unauthorized use of their portfolios. CBIR is the technology at issue here, and the one used by almost all photographers who do infringement mitigation.

CBIR systems "index images using the visual characteristics, such as color, texture and shape, which can be extracted from [the] image itself automatically." Mingling Li & Wei-Ying Ma, *Image Search Engine* in Encyclopedia of Multimedia (2d ed. 2008, Borko Furht, ed.) Visual search engines are used to query the index: a user inputs a digital image as a search query, and the systems perform a reverse-image search and "return a list of images that are similar to the query example in appearance." *Id.*; *see also Bell v. Wilmott Storage Servs., LLC*, 12 F.4th 1065, 1070 (9th Cir. 2021) ("[A] reverse image search uses an image to find either copies of the image, or other similar images on the Internet, in much the same way that a search of a string of text finds webpages that include that string of text." (citing Santi Thompson & Michele Reilly, A Picture Is Worth a Thousand Words, 68 J. Ass'n for

Info. Sci. & Tech. 2264, 2264–65 (2017))). Some visual search engines, such as Google Images[6] and Yahoo! Images,[7] are publicly available and can be freely used without a fee. Proprietary systems are also available.[8]

All visual search engines are limited in their search capability, however. The limitations manifest in two primary ways: in the size and scope of the index of images that the engine searches, and in the algorithm used to conduct the search.

*Index limitation*: CBIR systems are limited in the portion of the internet searched; no visual search engine searches the entire web, much less every digital image on the internet. Instead, each system uses its own index of images, which is created using confidential and proprietary methods.

For example, Google's index—long believed to be the largest index of digital images—had only 250 million images in 2001, the first year of

---

[6] Google Images, https://images.google.com/

[7] Yahoo! Image Search, https://images.search.yahoo.com/

[8] Tineye, https://tineye.com/; ImageRights, https://www.imagerights.com/

its existence.[9] Even by 2005, Google had indexed only 1 billion images, and 10 billion by 2010.[10] Within the past year, the size of Google's index was estimated to be just 136 billion images.[11] This amount pales in comparison to the estimated 750 billion images on the internet. Though other visual search engines have their own, smaller indexes, which may even contain images not in Google's index, the total number of indexed images is only a small portion of digital content across the entire internet. Visual search engine indexes simply have not kept up.

In fact, CBIR systems are unable to index certain websites, including some of that have enormous numbers of digital images. For example, Facebook, Instagram, Reddit, and X (formerly known as Twitter) all employ technologies that prevent web crawlers and spiders from accessing their sites to index text and images, that limit the ability of search engines to access accounts and posts, or that otherwise thwart

---

[9] Google Official Blog, Ooh! Ahh! Google Images presents a nicer way to surf the visual web (July 20, 2010), available at https://googleblog.blogspot.com/2010/07/ooh-ahh-google-images-presents-nicer.html

[10] *Id.*

[11] https://phototutorial.com/photos-statistics/#:~:text=750%20billion%20images%20are%20on,and%20only%207%25%20with%20cameras

the tools available to combat content piracy. Some technology companies have found workarounds, but they are costly, and new barriers are constantly being raised.

Moreover, even while digital images continue to be added to the internet, images also drop from or are removed from indexes. Popular and highly trafficked web domains and pages tend to be the most likely to be indexed; therefore, when web pages become stale or domains fall out of use, the images on them will fall out of the index, only to be re-indexed when they become active again. In short, visual search indexes are constantly changing as images are added and removed and are by no means a complete set of images online.

The index limitation produces several outcomes that are salient to statute-of-limitations issues: First, since visual search engines have separate indexes of varying size, and each creates their indexes in different ways, whether a search will find a specific image may depend on which engine is used. Second, given the changing nature of indexes, a search query may not find a specific image one day but may the next. None of this is within the control of content creators fighting piracy.

*Algorithm limitation*: Even if an image is indexed, a reverse-image search query will return a result—called a "hit" or "finding"—only if the engine's algorithm locates it. Like all technology, results will be limited by the quality and robustness of the programming and the protocols built into the code.

Broadly speaking, reverse-image searching uses computer vision technology to compare and match images based on similarities in textures, colors, shapes, and other contents of the image. Each visual search engine, whether publicly available or for private, commercial users, has its own confidential and proprietary algorithm for this process. Algorithms will vary in the ability to produce a match, and several factors affect this ability, including: how qualitative and quantitative requirements are set so as to call a match a match; whether the engine can analyze from multiple perspectives so as to catch copies that are flipped or reversed; and whether modifications such as surface text or other superimposed markings or images will prevent the engine from recognizing a match.

Search and match results further depend on factors outside of the algorithm itself. These include system limitations on file size or file type

that can be used as search input; the quality of the image input by a user into the engine; and the quality of the image on the web page that is indexed for search.

Because of the technological limitations described above, it is possible that a specific image on the web might never be found despite reverse-image searching on multiple platforms or systems, or it might be found only after several years, as search-engine indexes increase in size and reach, and search technology improves over time.

### 2. Verifying and confirming search results is time- and labor-intensive, adding a further limitation.

Even when technological limitations are overcome and a visual search engine delivers findings, there are additional human-resource limitations that interfere with the ability to quickly file lawsuits against unauthorized users.

The process of confirming valid infringements is rigorous, time-consuming, and expensive. There are several steps: First, the photographer must verify that the search result involves their own image and is not a false positive. Second, they must determine whether the sighting involves an image or user that has a prior authorization, license, or release. This requires identifying the user—the person or

entity responsible for posting the image—a difficult task that often requires access to public records and other research tools. Third, the photographer must analyze whether there is a viable fair-use or DMCA safe-harbor defense. Fourth, the photographer must determine whether personal and subject matter jurisdiction exist and whether any judgment can be enforced, then must physically locate the user for service of process.

Photographers must perform these steps for *every* finding that a visual search engine produces, and prolific photographers often have tens of thousands or even hundreds of thousands of findings. Each of these steps takes time, and only after they are complete would a photograph be chargeable with knowledge of a particular infringement. Accordingly, a statute-of-limitations analysis cannot simply begin and end with the questions "does the plaintiff use reverse-image search technology to find infringements and enforce copyrights."

## II. Robust and effective copyright protection rules are key to the livelihoods of photographers and other visual content creators.

In failing to recognize the technological realities discussed above, the decision below leads to financial consequences to photographers. Visual content creators rely on copyright protection to drive value for

their works. Effective rules that facilitate copyright protection and enforcement are therefore key to maintaining that value.

### A. Copyright protection is crucial for Amici and the photographers and visual content creators they represent.

Professional photographers and other creators make a living by selling their labor and by selling or leasing—through licensing—the product of that labor. The protection offered by the copyright laws is critical to their earning ability. As the Ninth Circuit observed, courts deciding copyright cases "are affecting the fortunes of people, many of whose fortunes are small." *Alaska Stock, LLC v. Houghton Mifflin Harcourt Publ'g Co.*, 747 F.3d 673, 686 (9th Cir. 2014).

For many artists, a significant portion of earnings from their professional work comes from the ability to license their works for use by others—sometimes orders of magnitude greater than earnings from their labor. This usage-based "rights managed" model of monetizing intellectual property is widespread among professional image creators as well as photo agencies, which act as licensing agents for large numbers of photographers. Their business models are based on the syndicated licensing of in-demand visual content of high-profile celebrities, newsworthy events, musicians, sports figures, politicians,

fashion icons, and royalty to the world's leading magazines, newspapers, Internet news outlets, and other media clients, often for substantial fees. These fees are shared with the artists who create the content.

At the core of the rights-managed model is the license agreement and license fee. Payment of the fee gives the licensee permission to the content in agreed ways. *See Alaska Stock*, 747 F.3d at 676. For content creators, it is the protection afforded by the copyright laws that drives the value of the license fee. "After all, given that so much of the value of [artistic creations] to content producers depends on legal protection being given to their works after they have been created and distributed, copyright law is critically important to ensuring that artists are compensated fairly." *Remarks of FCC Commissioner Mignon L. Clyburn*, Future of Music Coalition Policy Summit (Georgetown Univ. 2014), 2014 WL 5461985, at *2 (Oct. 27, 2014).

Content piracy interferes with this value proposition, and not just by depriving creators of licensing revenue. It also drives down the amount fees that creators can obtain, particularly for creators and photo agencies whose business models rely on licensing of timely,

popular content to media outlets for editorial uses. Customers will demand to pay less—or refuse to purchase altogether—knowing that the images they paid for will be widely available due to rampant infringement and competing for the same eyeballs.

Moreover, the internet has both revolutionized and challenged the creative industries. For less well-known creators, the internet provides visibility. People who hire photographers will, for the most part, find them online. But the internet has also facilitated wide-scale infringement. There is a widely held misconception, which many Amici have been dedicated to countering, that if content is on the internet, it is free to use by anyone who can access it, for any purpose. Creatives are caught in a dilemma: to sell their labor and the results of it, the photographer must place their images online, in the internet marketplace—the very venue that make it easy for others to steal and infringe their works—otherwise, they face invisibility from prospective buyers and a quick exit from the industry.

Effective copyright laws are the only resort of photographers and content creators faced with these realities. Many devote significant human and financial resources to combating online infringement. As

discussed above, the barriers they face are legion. Additional legal barriers should be avoided.

### B. The ruling below punishes photographers with robust enforcement systems.

But the decision below did not account for photographers' need for robust copyright protection. Copyright laws are supposed to "promote the progress of science and useful arts." U.S. Const., art. I, § 8. The district court's ruling did not do so; rather, it undermines the visual arts industries by penalizing content creators who engage in enforcement activity.

"[A] copyright holder does not have a general duty to 'police the internet to discover a defendant's use of his photographs.'" *Parisienne v. Scripps Media, Inc.*, No. 19 Civ. 8612, 2021 WL 3668084, at * (S.D.N.Y. Aug. 17, 2021) (quoting *Hirsch v. Rehs Galleries, Inc.*, No. 18 Civ. 11864 (VSB), 2020 WL 917213, at *5 (S.D.N.Y. Feb. 26, 2020)(cleaned up)); *see also MacLean Assoc., Inc. v. Wm. M. Mercer–Meidinger–Hansen, Inc.*, 952 F.2d 769, 780 (3d Cir.1991) (impose on a copyright owner a "never ending obligation to discover" infringements would be unreasonable). For those who do, however, the decision below imposes a greater

burden, one that ultimately makes it much more likely that their claims will be timed barred.

The arguments presented by Appellee in this matter, and endorsed by the district court below, strike at the heart of the impossible position that creators and photographers face. These arguments would ask this Court to support a framework that is without a solution. The district court held that "Plaintiff's relative sophistication as an experienced litigator in identifying and bringing causes of action for unauthorized uses of Grecco's copyrighted works leads to the conclusion that it should have discovered" these various infringements. *Michael Grecco Prods., Inc. v. RADesign, Inc.*, No. 21-cv-8381, --- F. Supp. 3d ----, 2023 WL 4106162, at *2 (S.D.N.Y. June 20, 2023). Yet that burden is not, and cannot be, on the copyright owner. As noted above, an average photographer might have a library of hundreds of thousands, or even millions, of images. Despite technological advances, it is nigh impossible to maintain complete observation of all these images. Imputing a responsibility on the photographer to be aware of every possible infringement without any evidence of actual notice is precisely at the heart of the design of protection of the discovery rule.

To find otherwise would be to eviscerate the ability of photographers to protect their most valuable assets.

The ruling also would hurt photographers who do not have extensive libraries of images. To say that those with fewer images should also be naturally aware of infringements precisely because they have fewer images in their archives again misses the point of the protections afforded photographers. Finding infringements is difficult under the best of circumstances. Photographers have seen their business models naturally shift over the years, but to place the burden of seeking out every infringement, and then punishing them if one were missed, is contrary to the purpose of copyright protection in the United States.

Amici and their member-photographers rely on the fair and even implementation of the discovery rule both out of necessity, due to the difficulty in finding such infringements, and out of practicality, evincing the realities of the profession as a whole. It is incumbent on photographers to promptly protect their rights when faced with knowledge of an infringement, but in the vast digital ecosphere where images are infringed with impunity, it is too high a bar for a court to

impute such knowledge of infringement on any photographer, no matter if they own 100 or 1,000,000 copyrights. Photographers are not in the business of finding infringements. They are in the business of taking images and contributing to the visual and creative community. That they must enforce their rights is a function of infringement, and those who commit such acts.

## CONCLUSION

For the foregoing reasons, this Court should reverse the district court's order dismissing the complaint as time barred and hold that analysis of the statute of limitations in this context should focus on whether and when search efforts located the infringements at issue.

Dated: January 24, 2024
      Los Angeles, California

      Respectfully submitted,

      *Of Counsel:*
      Thomas Maddrey
         *Chief Legal Officer*
      AMERICAN SOCIETY OF
      MEDIA PHOTOGRAPHERS
      Four Embarcadero Center
      Suite 1400
      San Francisco, CA 94111

      s/ Peter Perkowski
      Peter E. Perkowski
      PERKOWSKI LEGAL, PC
      515 S. Flower St., Suite 1800
      Los Angeles, CA 90071
      Tel: 213-340-5796

      *Attorneys for Amici Curiae*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Second Circuit Rules 29.1(c) and 32.1(a)(4) and Federal Rules of Appellate Procedure 29(a)(5) and 32(a)(7) because this brief contains 4,248 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word software in 14-point Century font.

Dated: January 24, 2024
Los Angeles, California

s/ Peter Perkowski
Peter E. Perkowski

*Attorneys for Amici Curiae*

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

Michael Grecco Productions, Inc. v.   23-1078-CV
RADesign, Inc.

**CERTIFICATE OF SERVICE**

I, Peter Perkowski, hereby certify under penalty of perjury that on

January 24, 2024, I served a copy of this Amicus Brief by electronic

filing with the Court's CM/ECF system, which gives notice to counsel

representing all parties in the action.


Dated:  January 24, 2024
        Los Angeles, California

s/  Peter Perkowski
Peter E. Perkowski